UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------X

JOHN SMALLS, RENEE SMALLS, and
MAURICE SMALLS,

        Plaintiffs,

        -v-

COUNTY of SUFFOLK, *et al.*,

        Defendants.

------------------------------------------------------X

**FILED**
**CLERK**

8/27/2019 9:01 am

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

Case No. 14-cv-4889 (SFJ)(AKT)
**Memorandum and Order**

FEUERSTEIN, S., Senior District Judge:

## I.    Introduction

Plaintiffs John Smalls ("John" or "Father"), Renee Smalls ( "Mother"; together with John or Father, the "Parents"), and Maurice Smalls ("Maurice"; collectively with John and Mother, the "Plaintiffs") commenced this civil rights action pursuant to 42 U.S.C. § 1983 against Defendants County of Suffolk ("County"), Deputy Sheriff Investigator Sargent John Della Rocca ("Della Rocca"), Deputy Sheriff Investigator Michael Rapp ("Rapp"), Deputy Sheriff Investigator Eugene Brosnan ("Brosnan"), Deputy Sheriff Investigator Gerard McGarty ("McGarty"; together with Della Rocca, Rapp, Brosnan, the "Investigators"[1]), Police Officer Steven Caparelli, s/h/a Steven Capelli ("Caparelli"), Police Officer Sabastian Lankewicz, s/h/a Sabastian Lankiewicz ("Lankewicz"), Police Officer Scott Lewis ("Lewis"; together with Caparelli, Lankewicz, the "Officers"[2]), and Detective Michael Maresca ("Maresca") (collectively, the Defendants),

---

[1] Deputy Sheriff Investigator Matthew Mullings ("Mullings") is not named as a defendant in this action. However, he was a member of the Warrant Squad, which tried to execute a Family Court warrant that is the subject of this action. (*See infra* at p.3.) For convenience, when the Court refers to the Investigators, Mullings is deemed included in that reference for the attempted execution of the Warrant on May 18, 2013.

[2] Plaintiffs also named Police Officers Lynch ("Lynch") and Webker ("Webker"). The County Attorney did not make an appearance on behalf of either Lynch or Webker. (*See* Case Docket*, in toto*; *see also* Answer (ECF No. 4).) Nor have Lynch or Webker answered Plaintiffs' Complaint.

alleging, *inter alia*, various violations of their constitutional rights arising out of the entry into their home on two occasion by the Investigators acting pursuant to a Warrant of Arrest with a Writ of Attachment issued by a Family Court judge and, by Maurice, a claim of use of excessive force in connection with one of the Investigators' home entries. (*See generally* Complaint ("Complaint")(ECF No. 1).) Presently before the Court is the County's motion seeking summary judgment in its favor on all of Plaintiff's claims (hereafter, the "Summary Judgment Motion") (*see* ECF No. 41; *see also* Mem. in Supp. ("Support Memo") (ECF No. 41-10)), which the Plaintiffs oppose (hereafter, "Opposition" or "Opp'n")(ECF No. 41-16). For the reasons that follow, the County's Motion is GRANTED.

---

Plaintiffs have not sought defaults against Lynch or Webker. Moreover, other than including Lynch and Webker in their caption, there is no mention of either Lynch or Webker in the Plaintiff's opposition to the County's motion for summary judgment (*cf.*, Opp'n (ECF No. 41-16) at 1, with Opp'n, *in toto*) or in their Local Rule 56.1 Statement (*see* ECF No. 41-13, *in toto*). Accordingly, Plaintiffs are deemed to have abandoned any claims against Lynch and Webker, warranting their dismissal from this action. *See* Fed. R. Civ. P. 41(b).

## II.    Background

### A. Factual Background[3]

#### 1. The Family Court Action and the Warrant

The Parents have a daughter,[4] Kwateria Smalls (hereafter, Daughter"), who is the mother of Jazarah Smalls Kelly (hereafter, "Child"), the Parents' granddaughter.  (*See* Rule 56.1 Counter, ¶3; John's Affidavit (Ex. 1).)  The Parents were seeking custody of the Child and, as such, "were the Petitioners in a Custody/Visitation Petition naming [Daughter] as respondent together with the [C]hild's father . . . , which was the genesis of [relevant] family court litigation [(hereafter, the "Family Court Action"]."  (*Id.*, ¶1.)  As part of that Action, on May 9, 2013, the Family Court judge issued a "Warrant of Arrest with a Writ of Attachment," which authorized the arrest of Daughter and directed that the Child "be delivered to the Family Court, or if the Court was not in session, then into the custody of Suffolk County Child Protective Services" (hereafter, the "Warrant").  (Rule 56.1 Statement, ¶¶2, 3; *see also* Warrant (Ex. A).)  The Warrant listed 83 Fillmore Avenue, Deer Park, New York 11729 (hereafter, the "Warrant

---

[3] Unless otherwise indicated, the facts are taken from Defendants' Rule 56.1 Statement in support of their Summary Judgment Motion (hereafter, "Rule 56.1 Statement")(*see* ECF No. 41-3), and Plaintiffs' Rule 56.1 Counterstatement (hereafter, "Rule 56.1 Counter")(*see* ECF No. 41-13).  Unless otherwise stated, a standalone citation to a Rule 56.1 Statement or Counterstatement denotes that either the parties agree, or the Court has determined, that the underlying factual allegation(s) is(are) undisputed.  Citation to a party's Rule 56.1 Statement or Counterstatement incorporates by reference the document(s) cited therein.

Lettered Exhibits are those of the Defendants and are attached to the Declaration of Attorney Brian C. Mitchell.  (*See* ECF No. 41-2.)  Numbered Exhibits are those of the Plaintiffs and are attached to Plaintiffs' Rule 56.1 Counterstatement.  (*See* ECF No. 41-13.)  For convenience, herein, Exhibits will be identified by their respective letter or number only.

[4] While not material to the present Summary Judgment Motion, the Plaintiffs state "Kwateria Smalls is [the] adopted *foster* daughter of [the Parents], and *not* the biological daughter of [Mother]."  (*See* Rule 56.1 Counter, ¶3 (emphasis in original).)

Address," "Fillmore Home" or "House") as the Daughter's address (*see id.*, ¶4), and was filed with the Suffolk County Sheriff's Department the same day.  (*See id.*, ¶5.)

When the Warrant was issued, Della Rocca "was the Commanding Officer of the Suffolk County Sheriff's Department Warrant Squad [(hereafter, "Warrant Squad")]," which is tasked with enforcing warrants "at the direction of the Court and pursuant to Court orders . . . ."  (*Id.*, ¶¶6, 7.)  A corresponding investigation file was opened that day (hereafter, the "Investigation File").  (*See, e.g.,* Della Rocca Depo. Tr. (Ex. B), 62:3-13; *see also generally id.* at 25:18-26:15, 47:14-50:19.)  He assigned the Warrant to Rapp and Mullings, the two officers who comprised the abuse and neglect section of the Warrant Squad (*see id.* at 5:12-23); McGarty and Bronson also worked on enforcing the Warrant.  (*See* Rule 56.1 Statement, ¶10.)  None of the Investigators were aware that the Parents were adverse parties to Daughter in the Family Court Action or that Father had informed the Family Court that Daughter no longer lived at the Warrant Address in the Fillmore House.  (*See id.*, ¶¶45-46.)

2. The Initial Warrant Investigation

On May 9, 2013, Rapp and Mullings went to the Warrant Address, which is also where the Plaintiffs live, and knocked on the door; after receiving no response, a business card was left at the House.  (*See id.*, ¶ 16; *cf.*, Rule 56.1 Counter, ¶16 (stating "no card was ever received by Plaintiffs"); *see also* John's §50-h Hr'g Tr. (Ex. E.), at 5:5-14; Maurice's §50-h Hr'g Tr. (Ex. F.), at 5:10-17).)  Also on that date, Della Rocca, Rapp, Mullins and McGarty went to a State Island location to follow up on information that Daughter and Child may be there; however, neither was found at that location.  (*See id.*, ¶19.)

On May 14, 2013, Rapp and Mullins returned to the Warrant Address; again, they received no response to their knock on the door of the House.  (*See id.*, ¶20.)  Immediately

thereafter, the two Investigators "canvassed the surrounding area, knocking on doors up and down the street." (*Id.*, ¶21.) During that canvassing, Rapp spoke with a woman, who wished to remain anonymous, but informed Rapp that she would see the Daughter at the Fillmore House on weekends, and she had seen the Daughter recently. (*See id.*, ¶22.) Rapp did not note this in the Investigation File. (Rule 56.1 Counter, ¶22; *see also* Della Rocca Depo. Tr., 62:3-13; 98:16-24 (admitting that source of information should have been noted in Investigation File); Rapp Depo. Tr. (Ex. C.), 48:4-50:19; 51:4-52:20 (admitting to not making any notation in Investigation File of receiving information about Daughter from anonymous informant; expressing concern over informant's identity being revealed).)

### 3. The May 18, 2013 Attempt to Execute the Warrant (the "May Attempt") and its Aftermath

On Saturday, May 18, 2013 (*see* Della Rocco Depo. Tr., 71:5-6, 98:4-7), based upon information that the Daughter had recently been seen on weekends at the Warrant Address, Della Rocca, Rapp, Mullins, and McGarty went to the Fillmore House at approximately 8:00 a.m. (*See* Rule 56.1 Statement, ¶23.) After no response to a knock on the front door, Investigators went around to the back of the House and entered it through a sliding glass door, approximately three inches ajar. (*See id.*, ¶¶25-27; *see also* ¶34 (John not at Warrant Address on May 18, 2013); *cf.*, Rule 56.1 Counter, ¶26 (relying on John's Affidavit, disputing that door was open).) After announcing their presence (*see* Della Rocca Depo. Tr., 794-8), the Investigators conducted a search of approximately 15-minutes, searching three bedroom that had closed, locked doors, looking for Daughter and Child. (*See* Rule 56. Statement, ¶¶28-29, 32.) "Two of the locked doors did not have door moldings and entrance was accomplished by spreading the door jambs allowing the door to open," and the other door "was opened with a credit card or pocket knife slid between the jamb and the door." (*Id.*, ¶¶30-31.) There is no dispute that no one was found

in the Fillmore House. Upon the Investigators leaving the House, the sliding glass door was locked; Della Rocca believed he left a business card before leaving the Fillmore House. (*See id.*, ¶42; *but, cf.*, 56.1 Counter, ¶42 (generally relying upon John's Affidavit in disputing Della Rocca fixied the back door).)

Unbeknownst to the Investigators, a neighbor who lived behind the Warrant Address recorded a video on his cell phone of the Investigators' entering the house. (*See id.*, ¶33.) Thereafter, John viewed the video a day or two later, after returning to the Fillmore House from an out-of-state trip. (*See id.*, ¶¶34-36.) Thereafter and although believing the persons in the video were police officers, John "called 911 to report a burglary of his home." (*Id.*, ¶37.) (Hereafter, the "Burglary Complaint".) Suffolk County police responded to the Burglary Complaint, sending a police car to the Warrant Address. (*See id.*, ¶38.) "Suffolk Police detectives came to [the Warrant Address], watched the video, took photographs and dusted and lifted prints." (*Id.*, ¶40.) On May 20, 2013, having been made aware of the Burglary Complaint, Della Rocca "called the Suffolk County Police to inform them that the Sheriff's Investigators were the persons that entered the [Fillmore H]ouse in connection with [the Warrant]." (*Id.*, ¶41.) Thereafter, the Burglary Complaint was closed. (*See* Suffolk County P.D.'s Burglary Report, included in Investigation File (Ex. D.) at 31.)

John testified at his §50-h Hearing that before May 18, 2013, while rushing to leave the Fillmore House, he left five hundred dollars ($500.00) in cash on top of the bedspread in his and Renee's bedroom. (*See* John's §50-h Hr'g Tr., 45:2-19.) He further stated, that while he usually kept money in the House, he did not generally leave it out in the open. (*See id.*, at 54:4-13.) Based solely on John's §50-h testimony, the Plaintiffs dispute the Investigators' claims that (1) they did not remove "any U.S. Currency from the house at 83 Fillmore Avenue on May 18,

2013", and (2) John has no proof to back up his claim that the Investigators took money from his bedroom during the May Attempt. (*See* Rule 56.1 Counter, ¶¶43-44 (citing John's §50-h Hr'g Tr., 44-48).) Competent evidence shows: John waited more than twenty-four (24) hours before reporting the alleged missing money (*see* Suffolk County P.D.'s Burglary Report, included in Investigation File at 29-30); John testified that he installed a lock on his bedroom door in response to Daughter having stolen jewelry and money from that room (*see id.*, 55); and, Della Rocca testified that, in a May 20, 2013 conversation with John, Della Rocca informed John there was no money on John's bed in response to John claiming money was missing from the bed (*see* Della Rocca Depo. Tr., 151:22-152:10).

### 4. The June 4, 2013 Attempt to Execute the Warrant (the "June Attempt")

On June 4, 2013, Della Rocca, Rapp, McGarty, and Brosnan went to a location on Staten Island attempting to find Daughter and Child. (*See* Rule 56.1 Statement, ¶48.) After being told Daughter was not staying at the Staten Island address, the Investigators returned to the Warrant Address "because they were at a loss for information and had no other leads as to the whereabouts of [Daughter] or [Child]" (*id.*, ¶50), and, therefore, wanted " to make another attempt at the [W]arrant [A]ddress to speak to a live body . . . which [the Investigators] still had not accomplished." (Rapp Depo. Tr., 77:4-8.)

When the Investigators arrived at the Warrant Address on June 4, 2013, Maurice answered the front door. (*See* Rule 56.1 Statement, ¶52.) It was the first time any of the Investigators had the opportunity to speak, in person, to an occupant of the Fillmore House. (*See* Rapp Depo. Tr., 79:23-25.) The Investigators explained they had the Warrant pursuant to which they were seeking the Child. (*See* Rule 56.1 Statement, ¶53; *see also* Rapp Depo. Tr. 79:20-22, 84:7-10.) Maurice objected to the Investigators entering the House, stating his father, John, did

not want them to come in (*see id.*, ¶54). Della Rocca and Rapp each testified that they found Maurice to be argumentative, noncooperative, and "less than truthful," which is not the typical reaction they encounter when asking family members if they can look in a house for a child subject to Family Court writ of attachment. (*See* Rule 56.1 Statement, ¶55; *see also* Della Rocca Depo. Tr., 108-112; Rapp Depo. Tr., 81-82.) Rapp also testified that he did not consider John's earlier Burglary Complaint as a factor in Maurice's protestations. (*See* Rapp Depo. Tr., 82-83.) Rather, based on Maurice's adversarial reaction, Della Rocca and Rapp believed Daughter and Child could be hiding in the Fillmore House at that time. (*See* Rule 56.1 Statement, ¶56; *see also* Della Rocca Depo. Tr., 109-110; Rapp Depo. Tr., 81-82, 87-88.)

Maurice called John, and then passed his phone to Della Rocca. (*See* Rule 56.1 Statement, ¶¶54, 57; *see also* Maurice's §50-h Hr'g Tr., 59:5-10.) Taking Maurice's phone, Della Rocca explained to John that the Investigators wanted to quickly search the Fillmore House pursuant to the Warrant to see if the Daughter and Child were there. (*See* Rule 56.1 Statement, ¶57.) In response, John inquired "why [Della Rocca] broke into the house on May 18, 2013, why he stole the currency in his bedroom, and why he broke into each and every locked room." (Rule 56.1 Counter, ¶57.) According to Della Rocca, in that conversation, John never mentioned that the Daughter no longer resided at the Warrant Address or that she was not currently at the Fillmore House. (*See* Rule 56.1 Statement, ¶59; *see also* John §50-h Hr'g Tr., 81:3-82:20.) According to John, during that phone conversation, Della Rocca never inquired as to either the Daughter's current residency or location. (*See* 56.1 Counter, ¶57.)

While Della Rocca was on the phone with John, the other Investigators, having explained to Maurice they had the Warrant, passed Maurice and entered the Fillmore House. (*See* Rule 56.1 Statement, ¶¶ 53, 60.) "When entering the [Fillmore H]ouse, [] McGarty moved Maurice []

aside . . . pushing him with his [(McGarty's)] stomach and then . . . shoving him . . . with the

back of his arm." (*Id.*, ¶¶62-63.)  Maurice was not physically injured by McGarty's actions.

(*See id.*, ¶63.)  the Investigators were in the Filmore House for approximately ten minutes.  (*See*

Maurice's §50-h Hr'g Tr., 61:15-18; Della Rocco Depo. Tr., 126:12-14.)

### B. Procedural Background

On August 18, 2014, Plaintiffs commenced this action alleging that:

(1)  as a result of the Investigators' alleged forcible entries into the Fillmore House, their constitutional rights were violated (*e.g.*, freedom from: unreasonable search and seizure; unlawful detention; use of excessive force in detention; deprivation of liberty without due process; and denial of equal protection) (*see* Complaint, First Cause of Action against all Defendants (brought pursuant to § 1983));

(2)  the County had a custom and practice of failing to adequately train and supervise its employees on how to avoid violating civilians' constitutional rights and it had actual or constructive notice of such failures (*see id.*, Second Cause of Action against Defendant County (brought pursuant to § 1983));

(3)  Della Rocca, an individual with supervisory responsibility over other Investigators and knowing of the Plaintiffs' constitutional rights, failed to prevent the constitutional deprivations suffered by the Plaintiffs, which was grossly negligent (*see id.*, Third Cause of Action against all Defendants (brought pursuant to § 1983)); and

(4)  "[i]n derogation of their duties, the individual defendants, having the power to do so, failed, neglected and/or refused to prevent the commission of the unlawful stop, false detainment, unlawful accusation, wrongful arrest, false imprisonment, and wrongful seizure of the [P]laintiffs and their property," which resulted in the depriving the Plaintiffs of their constitutional rights (*id.*, Fourth Cause of Action against all Defendants (brought pursuant to 42 U.S.C. § 1986).

On September 8, 2014, the Defendants answered the Complaint,[5] denying the Plaintiffs'

allegations and raising several affirmative defenses, including their entitlement to qualified

immunity protection.  (*See* Answer (ECF No. 4).)  After a dismissal of this case, which was

---

[5]  *See supra* note 2.

subsequently vacated (*see* ECF No. 29), on July 23, 2018, the Defendants moved for summary judgment in their favor as to all of Plaintiffs' federal law claims. They further requested that "in light of a lack of viable federal claim[,] the Court decline jurisdiction of the [P]laintiffs' state claims, or dismiss them consistent" with their arguments advanced in support of the Summary Judgment Motion. (Support Memo at 23.)

### C. The Parties' Positions

#### 1. The Defendants[6]

The Defendants state that the "[P]laintiffs' claims arise out of the entry into their home on May 18, 2013 and June 4, 2013 by Suffolk County Deputy Sheriffs acting pursuant to a Warrant of Arrest with a Writ of Attachment issued on May 9, 2013 by the [a] Suffolk County Family Court Judge . . . ." (Support Memo at 10-11.) They argue that the Investigators' searches of the Warrant Address in May and June of 2013 were constitutional because on each occasion, the Investigators had a reasonable belief that the Daughter was a resident of the Warrant Address and a reasonable belief that she was present. (*See id.* at 12-13.) They assert that it was also significant that none of the Investigators knew either that the Parents had initiated the Family Court Action against Daughter, making them adversaries, or that John had informed the Family Court that Daughter was no longer in the House. (*See id.* at 13.) Without this information, the Defendants claim, "it was not unreasonable for the [Investigators] to believe that John Smalls or Maurice Smalls might be protecting [Daughter] from arrest." (*Id.*) In any event, the Defendants posit that the Warrant "provided an independent justification for the [W]arrant

---

[6] Only the Defendants' arguments regarding the Plaintiffs' federal-law causes of action are discussed herein. (*See also infra* at Part III(B)(8) (discussing the Court's determination to decline exercising supplemental jurisdiction over Plaintiffs' pendent state-law causes of action).)

[S]quad's entry and search." (*Id.* at 13-14.) Hence, there is no merit to the Plaintiffs' claims of constitutional violations. (*See id.* at 14.)

To the extent the Plaintiffs claim property damage, the Defendants would have the Court find that claim to be meritless as it is well recognized that, when executing a warrant, officers may damage property in performing their duties. (*See id.* (quoting *Cody v. Mello*, 59 F.3d 13, 16 (2d Cir. 1995); *Bartlett v. City of N.Y.*, No. 03-cv-1961, 2005 WL 887112, at *7 (E.D.N.Y. Feb. 11, 2005); further citations omitted).) The Defendants also present an alternative basis for justifying their entries into the Plaintiffs' house, *i.e.*, the emergency aid doctrine, an exception to the Fourth Amendment. (*See id.* at 14-16.) In sum, they contend that, since one of the goals of executing the Warrant was locating and securing the Child, who may have been subject to abuse or neglect, the Investigators were justified in their entries into the House. (*See id.* at 15-16.) Regarding Maurice's excessive force claim, Defendants advance the position that, since McGarty's conduct did not result in any physical injury to Maurice, no claim lies. (*See id.* at 16-17.)

Defendants further claim qualified and quasi-judicial immunities. Regarding qualified immunity, they base their claim on the contention that "[w]hile officers of reasonable competence could have disagreed on whether the information known to them was sufficient to reach th[eir] conclusion [to enter the House], it was not plainly incompetent or a knowing violation of the law for the [D]efendants to believe that [the Daughter] was at the [Warrant Address] on both [the May and June 2013] occasions." (*Id.* at 18.) They also assert that at the time of the May and June 2013 Attempts, it could not be said that it was clearly established that those Attempts would be violative of a Plaintiffs' constitutional rights; hence, the Defendants are entitled to qualified immunity. (*See id.* at 19.) As to quasi-judicial immunity, the Defendants

argue that since the Investigators "were proceeding pursuant to a validly issued [Warrant] from the Suffolk County Family Court, and are the enforcement arm of that Court, they would be entitled to" such immunity for their acts.  (*Id.* at 20 (citing *Morris v. Katz*, No. 11-cv-3556, 2011 WL 3918965 (E.D.N.Y. Sept. 4, 2012); *Maldonado v. N.Y. County Sheriff*, No. 05-cv-8377, 2006 WL 2588911, at *3 (S.D.N.Y. Sept. 6, 2006).)

To the extent the Plaintiffs claim that the Officers failed to properly investigate John's Burglary Complaint, the Defendants posit that is not a viable cause of action since the record demonstrates an investigation was conducted and then concluded when it was learned that no burglary occurred: that the May Attempt was made pursuant to the Warrant (*see id.* at 21); and, in any event, "allegations of a failure to investigate do not create an independent due process claim."  (*Id.* (quoting *Blake v. Race*, 487 F. Supp.2d 187, 212 n.18 (E.D.N.Y. 2007); further citation omitted).)  Further, the Defendants argue that Plaintiffs cannot make out their *Monell* cause of action because there are no underlying constitutional violations.  (*See id.* at 22.)  In any event, Plaintiffs have not produced evidence of any County policy, custom or procedure that was the proximate cause of the alleged constitutional violations.  (*See id.*).  Finally, the Defendants "request, in light of a lack of a viable federal claim that the Court decline jurisdiction of the [P]laintiffs' state claims[]or dismiss them."  (*Id.* at 23.)

## 2. The Plaintiffs

The essence of the Plaintiffs' opposition is their disagreement with the Investigators that the Investigators had reasonable beliefs prior to entering the Fillmore House on May 18, 2013 and June 4, 2013 that Daughter and Child were there.  (*See* Opp'n at 4-8.)  They contend the record evidence does not support the Investigators' supposed reasonable belief that Daughter was present before the Investigators' May and June Attempts.  (*See id.*)  Indeed, since Father and

Mother were the relators to Family Court and Child Protective Services that Daughter had left the Fillmore House, which led to the issuance of the Warrant, the Investigators' Attempts could not be reasonable, but, rather, were unconstitutional.

Plaintiffs raise the same argument in opposing the Defendants' "Property Damages" argument, *i.e.*, the Investigators' search on May 18, 2013 was unreasonable since they already knew, from the information provided by Father and Mother, that Daughter could not be at the Warrant Address. (*See id.* at 8.) They also contend "Plaintiffs' claim for the $500 missing is supported by the [§]50h hearing testimony of [John], as well as the admissions of the Warrant Squad that they did indeed break into [the Parents'] bedroom with either a pocket knife or credit card." (*Id.*) Further, they would have the Court disregard the Defendants' invocation of the "Emergency Aid Doctrine" asserting the record does not support an "'objectively reasonable basis for believing' that medical assistance was needed, or that there were persons in danger." (*Id.* (quoting *Brigham City, Utah v. Stuart*, 547 U.S. 398 (2006)).) In opposition to the Defendants' excessive force argument, Plaintiffs argue: Maurice's claim is governed by the Fourth Amendment analysis since he was never arraigned (*see id.* at 9 (quoting *Lemmo v. McKoy*, No. 08-cv-4264, 2011 WL 843974, at *4 (E.D.N.Y. Mar. 8, 2011)); some courts in this Circuit have "allowed plaintiffs to recover, even though the injury caused was not permanent or severe, where the force used was excessive" (*id.* (quoting *Lemmo*, 2011 WL 843974, at *6)); and, the force used by McGarty was gratuitous and excessive in the face of Maurice's lawful and cooperative behavior. (*See id.* at 10.) Thus, Plaintiffs' maintain that their excessive force claim should remain. (*See id.*)

Plaintiffs also posit that the Defendants are not entitled to qualified immunity, asserting it was objectively unreasonable for the Investigators to believe Daughter and Child were at the

Fillmore Address during the May and June Attempts. They also argue that the record, particularly the Investigation File, does not support a finding that the circumstances surrounding those Attempts was "something less than 'clearly established' conduct, violative of the Fourth Amendment." (*Id.; see also id.* at 11.) Further, characterizing the May and June Attempts as "breaking and entering without justification," Plaintiffs assert those Attempts cannot be viewed as executing a mandate of the Family Court; therefore, quasi-judicial immunity is not available to the Defendants. (*See id.* at 11 (further arguing the cases relied upon by Defendants in support of quasi-judicial immunity are inapposite to the facts of the present case).)

As to their failure-to-investigate claims against the Police, while acknowledging there is no dispute that the Police came to the Fillmore Address, viewed the video, lifted finger prints and took photographs of the alleged damage to the House, Plaintiffs take issue with John's Burglary Complaint being closed upon the unverified word of Della Rocca that the Investigators were attempting to execute the Warrant. (*Id.* at 11-12.) The Plaintiffs make much of the fact that "this was the only instance" where a criminal investigation was closed as "non-criminal" based upon the request of another law enforcement agency, but do not articulate the relevance of same as it relates to this claim. (*Id.* at 12.)

The extent of the Plaintiffs' opposition to the Defendants' seeking to dismiss Plaintiffs' state law causes of action is that the Defendants' contentions that the evidence does not support claims of constitution violations and federal causes of action "are without any support." (*Id.*) The Plaintiffs' challenge to the County's *Monell* argument, *i.e.*, that there is no evidence of a County policy, custom or procedure that lead to or was the proximate cause of the violation of Plaintiffs' constitutional rights, rests upon the supposed "uncontroverted evidence [] that the Warrant Squad has been breaking into houses purportedly to effect arrest warrants for 14 years."

(*Id.* at 13.)  It appears Plaintiffs would also have the Court find a County constitutionally-violative custom or practice based upon Della Rocca's prior instruction by more senior investigators to use less intrusive methods than door rams and pry bars to open locked doors. (*See id.*)  In their Opposition, the Plaintiffs have not specifically addressed their Third Cause of Action, for so-called "Individual Supervisory Liability", which appears to be based upon Della Rocca's alleged failure to properly train other investigators and which Plaintiffs allege amounted to gross negligence.  (*See* Complaint at ¶76.)

III.  Discussion

    *A.  Applicable Law*

        1.  Motion for Summary Judgment Standard

"Summary judgment is proper 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *ING Bank N.V. v. M/V TEMARA, IMO No. 9333929*, 892 F.3d 511, 518 (2d Cir. 2018) (quoting Fed. R. Civ. P. 56(a)); *accord Jaffer v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018).  In ruling on a summary judgment motion, the district court must first "determine whether there is a genuine dispute as to a material fact, raising an issue for trial."  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotations and citations omitted); *see also Ricci v. DeStefano*, 557 U.S. 557, 129 S. Ct. 2658, 2677 (2009) ("On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party *only* if there is a 'genuine' dispute as to those facts." (emphasis added; internal quotations and citation omitted)).

In reviewing the record to determine whether there is a genuine issue for trial, the court must "construe the evidence in the light most favorable to the non-moving party," *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017)

(quotations, alterations and citation omitted), and "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." *Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 45 (2d Cir. 2019) (quotations and citation omitted); *see also Hancock v. County of Rensselaer*, 823 F.3d 58, 64 (2d Cir. 2018) ("In determining whether there is a genuine dispute as to a material fact, we must resolve all ambiguities and draw all inferences against the moving party."). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci*, 557 U.S. at 586 (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348 (1986)); *accord Baez v. JetBlue Airways Corp.*, 793 F.3d 269, 274 (2d Cir. 2015).

"The moving party bears the initial burden of showing that there is no genuine dispute as to a material fact." *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (quotations, brackets and citation omitted); *accord Jaffer*, 887 F.3d at 114. "[W]hen the moving party has carried its burden[,] . . . its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . [,]" *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec.*, 475 U.S. at 586-87), and must offer "some hard evidence showing that its version of the events is not wholly fanciful[.]" *Miner v. Clinton County, N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008) (quotations and citation omitted). The nonmoving party can only defeat summary judgment by "adduc[ing] evidence on which the jury could reasonably find for that party." *Lyons v. Lancer Ins. Co.*, 681 F.3d 50, 56 (2d Cir. 2012) (quotations, brackets and citation omitted). "'The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient' to defeat a summary judgment motion[,]" *Fabrikant v. French*, 691 F.3d 193, 205 (2d Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 252 (1986)), and "[a] court cannot credit a plaintiff's merely speculative or conclusory assertions." *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012); *see also Federal Trade Comm'n v. Moses*, 913 F.3d 297, 305 (2d Cir. 2019) ("[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." (quoting *Fletcher v. Alex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995))); *Flores v. United States*, 885 F.3d 119, 122 (2d Cir. 2018) ("While we are required to resolve all ambiguities and draw all permissible factual inferences in favor of the non-moving party, . . . conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment[.]" (quotations, alterations and citations omitted)); *Elliott v. Gouverneur Tribune Press, Inc.*, No. 13-cv-0055, 2014 WL 12598275, at *2 (N.D.N.Y. Sept. 29, 2014) ("[I]t is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings." (citing *Celotex Corp., v. Catrett*, 477 U.S. 317, 324 (1986); further citation omitted)). Since "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party[,] . . . [i]f the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (quotations and citations omitted).

Summary judgment is warranted, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *accord El-Nahal v. Yassky*, 835 F.3d 248, 252 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 2187 (2017); *see also Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014) ("[W]here the nonmoving party will bear the burden of proof on an issue at trial, the moving party may satisfy its burden [of showing the absence of a genuine dispute as

to any material fact] by pointing to an absence of evidence to support an essential element of the nonmoving party's case[.]" (quotations, alterations and citation omitted)). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322-23; *accord Crawford*, 758 F.3d at 486; *see also Chandok v. Klessig*, 632 F.3d 803, 812 (2d Cir. 2011) ("Where the undisputed facts reveal that there is an absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements become immaterial and cannot defeat a motion for summary judgment."). "The moving party is entitled to a judgment as a matter of law because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex*, 477 U.S. at 323 (quotations and citation omitted). Accordingly, when "the burden of persuasion at trial would be on the non-moving party . . . the party moving for summary judgment may satisfy his burden of production under Rule 56 in either of two ways: (1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim." *Nick's Garage*, 875 F.3d at 114 (quotations and citation omitted); *see also DeRogatis v. Bd. of Trs. of Welfare Fund of Int'l Union of Operating Eng'rs Local 15, 15A, 15C & 15D, AFLCIO*, 904 F.3d 174, 187 (2d Cir. 2018) (holding that when the ultimate burden of proof at trial would be on the non-moving party, the moving party "may satisfy their burden of production under Rule 56 by negating an essential element of the [non-moving party's] claim, whether by submitting undisputed evidence to that effect or by demonstrating the insufficiency of the [non-moving party's] own evidence." (quotations, alterations and citation omitted)); *see also Fuertado v. City*

*of N.Y.*, 337 F. Supp.2d 593, 599 (S.D.N.Y. 2004)("The moving party may use a memorandum or brief to 'point to' the absence of evidence and thereby shift to the non-movant the obligation to come forward with admissible evidence supporting its claim." (citations omitted)); *Olutosin v. Lee*, No. 14-cv-0685, 2018 WL 4954107, at *8 (S.D.N.Y. Oct. 12, 2018)(same (citing *Fuertado*)).

### 2. Quasi-Judicial Immunity

[I]n acting pursuant to a court order, [a sheriff is] protected from liability by quasi-judicial immunity. The Supreme Court has held that "state judges are absolutely immune from liability for their judicial acts." *Briscoe v. LaHue,* 460 U.S. 325, 334 (1983). "In addition, some officials who are not judges but 'who perform functions closely associated with the judicial process' have also been accorded such immunity." *Dorman v. Higgins,* 821 F.2d 133, 137 (2d Cir. 1987) (citation omitted) *(quoting Cleavinger v. Saxner,* 474 U.S. 193, 200 (1985)) (holding that probation officers are entitled to quasi-judicial immunity for carrying out court order). Such quasi-judicial immunity is granted based on "functional categories, not the status of the defendant." *Briscoe,* 460 U.S. at 342. Thus, because the function being performed is deemed integral to the judicial process, "persons who faithfully execute valid court orders are absolutely immune from liability for damages in actions challenging conduct authorized by the order." *Wilkinson v. Russell,* 973 F. Supp. 437, 440 (D. Vt. 1997) (citations omitted); *see also Rolan v. Phillips,* 19 F.3d 552, 556 (11th Cir. 1994) (sheriff entitled to quasi-judicial immunity); *Henry v. Farmer City State Bank,* 808 F. 2d 1228, 1238-39 (7th Cir. 1986) (absolute quasi-judicial immunity protected a Sheriff who enforced a money judgment because the Sheriff "was at all times acting pursuant to an official court order"); *Tymiak v. Omodt,* 676 F.2d 306, 308 (8th Cir. 1982) (per curiam) (sheriff was immune when he executed a court-ordered warrant of eviction); *Slotnick v. Garfinkle,* 632 F.2d 163, 166 (1st Cir. 1980) (per curiam) ("Judicial immunity extends as well to those who carry out the orders of judges.") (citation omitted); *Tornheim [v. Eason],* 363 F. Supp.2d 674 [(S.D.N.Y. 2005)](same); *Reisner v. Stoller,* 51 F. Supp.2d 430, 444 (S.D.N.Y. 1999) (absolute judicial immunity protects "acts of a ministerial nature performed at the direction of a judge").

Absolute immunity is appropriate for such acts because "officials must be permitted to rely upon a judge's findings and

> determinations to preserve the integrity of the court's authority and
> ability to function." *Bush v. Rauch,* 38 F.3d 842, 847 (6th Cir.
> 1994). Holding the official liable "would result in the official
> second-guessing the judge who is primarily responsible for
> interpreting and applying the law." *Id.*

*Maldonado,* 2006 WL 2588911, at *5-6; *see also id.* at *3; *Tomassi v. Sheehan*, No.15-cv-3605,

2016 WL 4768826, at *8 (E.D.N.Y. Aug. 23, 2016)(report and recommendation), *adopted*, 2016

WL 4767539 (E.D.N.Y. Sept. 9, 2016).

    3. <u>Qualified Immunity from § 1983 Liability</u>

"[A]n official is entitled to qualified immunity (1) if the plaintiff has not alleged a

violation of a constitutional right, (2) if that right was not clearly established at the time of the

conduct, *or* (3) if the official's actions were not objectively unreasonable in light of clearly

established law." *Almonte v. City of Long Beach*, 478 F.3d 100, 109 (2d Cir. 2007) (citing

*Harhay v. Town of Ellington Bd. of Educ.*, 323 F.3d 206, 211-12 (2d Cir. 2003)); *see also Wilson*

*v. Layne*, 526 U.S. 603, 609 (1999) (stating individual defendants are "'shielded from liability

for civil damages'" under §1983 if "their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known" (quoting *Harlow v.*

*Fitzgerald*, 457 U.S. 800, 818 (1982)). "A right is clearly established if (1) the law is defined

with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right,

and (3) 'a reasonable defendant [would] have understood from the existing law that [his] conduct

was unlawful.'" *Anderson v. Recore*, 317 F.3d 194, 197 (2d Cir.2003)(quoting *Young v. County*

*of Fulton*, 160 F.3d 899, 903 (2d Cir.1998)); *see also Mandola v. County of Nassau*, 222 F.

Supp.3d 203, 216 (discussing qualified immunity standard); *Laster v. Mancini*, No. 07-cv-8265,

2013 WL 5405468, at *30 (S.D.N.Y. Sept. 25, 2013)(adopting report and

recommendation)(same).

As the Second Circuit has described it, "qualified immunity provides a broad shield," thereby giving officials "'breathing room to make reasonable but mistaken judgments' without fear of potentially disabling liability." *Zalaski v. City of Hartford*, 723 F.3d 382, 389 (2d Cir. 2013) (quoting *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012)). It "shields public officials from personal liability for official actions, 'unless their conduct violates clearly established constitutional rights of which an objectively reasonable official would have known.'" *Almonte*, 478 F.3d at 108 (quoting *Harhay*, 323 F.3d at 211; further citation omitted).

In making determinations on qualified-immunity claims, the Supreme Court requires a court to determine two matters, *i.e.*, (1) whether the facts alleged by the plaintiff are sufficient to make out a violation of a constitutional right, and (2) whether the right at issue was clearly established at the time of the alleged misconduct. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (discussing *Saucier v. Katz*, 533 U.S. 194 (2001)). It is within the court's discretion to determine which of the two inquiries to decide first. *See id.* at 236.

### 4. § 1983 Causes of Action, Generally

Section 1983 provides for an action at law against a "person who, under color of any statute, ordinance, regulation, custom, or usage of any State . . . subjects or causes to be subjected, any citizen of the Unites States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and law." 42 U.S.C. § 1983. It "is not itself a source of substantive rights"; rather, it merely provides "a method for vindicating federal rights elsewhere conferred . . . ." *Patterson v. County of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004)(quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)); *see also Lockwood v. Town of Hempstead*, No. 16-cv-3756, 2017 WL 3769253, at *2 (E.D.N.Y. Aug. 28, 2017) (stating § 1983 provides only a procedure for redress for the deprivation of rights established elsewhere)(adopting report &

recommendation). "Therefore, to prevail on a claim arising under Section 1983, a plaintiff must

establish: '(1) the deprivation of any rights, privileges, or immunities secured by the Constitution

and its laws; (2) by a person acting under the color of state law.'" *Lockwood*, 2017 WL

3769253, at *2 (quoting *Hawkins v. Nassau County Corr. Facility*, 781 F. Supp.2d 107, 111

(E.D.N.Y. 2011)).

### 5. Claims Premised upon Searches

> As a general rule, "the police do not need a search warrant to enter a suspect's home when they have an arrest warrant for the Suspect." *United States v. Lauter*, 57 F.3d 212, 214 (2d Cir. 1995); *see also Cogswell v. County of Suffolk Sheriff's Dep't*, 375 F. Supp.2d 182, 187 (E.D.N.Y. 2005)(applying the same principles to bench warrants). That is because "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton v. New York*, 445 U.S. 573, 603 (1980). Thus, officers "may enter a suspect's residence, or what they have reason to believe is his residence, in order to effectuate an arrest warrant *where a reasonable belief exists that the suspect is present*." *Lauter*, 57 F.3d at 214. The reasonable belief standard requires a lesser showing than probable cause. *See id.* at 215. Moreover, for a belief to be reasonable, it need not turn out to be correct. *See, e.g., United States v. Lovelock*, 170 F.3d 339, 343 (2d Cir. 1999). Once officers have lawfully entered a residence pursuant to an arrest warrant, "they may conduct a search of the premises to the extent necessary to locate the individual to be arrested." *United States v. Passaarella*, 788 F.2d 377, 381 n.4 (6th Cir.1986)(citing cases); *cf., Maryland v. Buie*, 494 U.S. 325, 330 (1990)("[U]ntil the point of Buie's arrest the police had the right, based on the authority of the arrest warrant, to search anywhere in the house that Buie might have been found, including the basement.")

*Cancel v. N.Y.P.D. Comm'r Kelly*, No. 13-cv-6007, 2016 WL 590230, at * 6 (S.D.N.Y. Feb. 11,

2016)(emphasis added); *see also Bartlett v. City of N.Y.*, No. 03-cv-1961, 2005 WL 887112, at

*5 (E.D.N.Y. Feb. 11, 2005)("[O]fficers who enter a dwelling in order to execute a valid arrest

warrant need only a 'reasonable belief that the suspect resides at the place to be entered to

execute an arrest warrant,' and a reasonable belief that 'the suspect is present.'" (quoting *Lauter*, 57 F.3d at 215; further citation omitted)); *Anderson v. United States*, 107 F. Supp.2d 191, 196 (E.D.N.Y. 2000)("So long as the authorities have a reasonable belief that a suspect will be found at a given residence, it is not necessary that the belief also be correct." (citing *Maryland v. Garrison*, 480 U.S. 79 (1987); *Lovelock*, 170 F.3d at 342)).

### 6. Excessive Force Claim

Claims against police officers for using "excessive force" are analyzed under the Fourth Amendment's reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 397 (1989). Determining whether the force used was unreasonable, and therefore excessive, requires "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Brown v. City of New York*, 798 F.3d 94, 100 (2d Cir. 2015) (quoting *Graham*, 490 U.S. at 396 (internal quotation marks omitted)). This balancing requires close examination of the totality of the circumstances in each particular case, including whether the suspect poses a threat to the safety of others, resists or attempts to evade arrest, and the severity of the crime at issue. *Id.* (citing *Graham* 490 U.S. at 396). The Court must also be mindful that "police officers are often forced to make split-second judgments— in circumstances that are tense, uncertain, and rapidly evolving— about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.

At the summary judgment stage, because of the "fact-specific nature" of the objective reasonableness inquiry, "granting summary judgment against a plaintiff on an excessive force claim is not appropriate unless no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable." *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 123 (2d Cir. 2004). Thus, to prevail on a motion for summary judgment, the evidence must show that "no rational jury could [find] that the force used was so excessive that no reasonable officer would have made the same choice." *Lennon v. Miller*, 66 F.3d 416, 426 (2d Cir. 1995).

*Burch v. City of N.Y.*, No. 11-cv-2841, 2016 WL 11430773, at *9 (E.D.N.Y. Apr. 22, 2016); *see*

*also Hodge v. Vill. of Southampton*, 838 F. Supp.2d 67, 75 (E.D.N.Y. 2012)("Determining

whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment

requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth

Amendment interests against the countervailing government interests at stake." (quoting

*Graham*, 490 U.S. at 396 (citations and internal quotations omitted))); *Lemmo*, 2011 WL

843974, at *4-6 (discussing *Graham*).

### 7. *Monell* Claim

Under *Monell v. Dep't of Social Services,* 436 U.S. 658, 98
S. Ct. 2018, 56 L.Ed.2d 611 (1978), "a municipality can be held
liable under Section 1983 if the deprivation of the plaintiff's rights
under federal law is caused by a governmental custom, policy, or
usage of the municipality." *Jones v. Town of E. Haven,* 691 F.3d
72, 80 (2d Cir. 2012). In order to prevail on such a claim against a
municipal defendant, the plaintiff must establish as a prerequisite
an underlying constitutional violation on the part of individual
municipal actors. *See Segal v. City of N.Y.,* 459 F.3d 207, 219 (2d
Cir. 2006) ("*Monell* does not provide a separate cause of action for
the failure by the government to train its employees; it *extends*
liability to a municipal organization where that organization's
failure to train, or the policies or customs that it has sanctioned, led
to an independent constitutional violation."); *Askins v. Doe No. 1,*
727 F.3d 248, 253 (2d Cir. 2013) (same).

*Sethi v. Nassau County*, No. 11-cv-6380, 2014 WL 2526620, at *6 (E.D.N.Y. June 3, 2014); *see*

*also Moroughan v. County of Suffolk*, 99 F. Supp.3d 317, 326 (E.D.N.Y. 2015)(same).

### 8. § 1986 Cause of Action

"Section 1986 provides a cause of action against anyone who having knowledge that any

of the wrongs conspired to be done and mentioned in section 1985 are about to be committed and

having power to prevent or aid, neglects to do so. Thus, a § 1986 claim must be predicated upon

a valid § 1985 claim." *Thomas v. Roach*, 165 F. 3d 137, 147 (2d Cir. 1999) (internal quotations

and citations omitted); *see also White v. City of N.Y.*, No. 17-cv-2404, 2019 WL 1428438, at \*4 (S.D.N.Y. Mar. 29, 2019) (same (quoting *Thomas*)); *K.W., ex rel., Brown v. City of N.Y.*, 275 F.R.D. 393, 399 (E.D.N.Y. 2011) (same (quoting *Thomas*)).

B. *The Instant Case*

As a preliminary matter, the Court finds that the following facts regarding the May Attempt are not material to the Plaintiffs' § 1983 claims:  whether the sliding glass door at the back of the Fillmore House was opened; whether there was money on the Parents' bed; and whether the Investigators left a business card in the House.  Even if that were not so, to the extent the Plaintiffs try to create disputes as to these facts relying upon John's Affidavit (*see* Ex. 1 at ¶10 (re: door), ¶12 (re: money), and ¶9 (re: business card)), those attempts are unavailing. John's Affidavit was made well after he testified at his § 50-h hearing.  (*Cf.*, John's Affidavit at (unnumbered) 3 (sworn to in July 2018), *with* John's §50-h Hr'g Tr., 1, 3 (sworn testimony given Mar. 28, 2014).)  However, it is well-settled law in this Circuit that a party is prohibited "from defeating summary judgment simply by submitting an affidavit that contradicts the party's previous sworn testimony."  *In re Fosamax Prods. Liab. Litig.*, 707 F.3d 189, 193 (2d Cir. 2013); *see also Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001)("[F]actual allegation that might otherwise defeat a motion for summary judgment will not be permitted to do so when they are made for the first time in the plaintiff's affidavit opposing summary judgment and that affidavit contradicts h[is] own prior deposition testimony.").  Indeed, where inconsistencies exist between a non-movant's affidavit and corresponding deposition testimony, which inconsistencies the non-movant party makes no effort to reconcile or otherwise explain, a court may disregard those statements.  *See Jeffrey v. Montefiore Med. Ctr.*, No. 11-cv-6400, 2013 WL 5434637, at \*15 (S.D.N.Y. Sept. 27, 2013)(collecting cases).

### 1. Quasi-Judicial Immunity

The Defendants seek quasi-judicial immunity, and they are entitled to it. There is no dispute that the May and June Attempts by the Investigators were done pursuant to the Family Court's valid, active Warrant. The Warrant was a Family Court mandate providing that court's written directions to arrest the Daughter and bring her before the Family Court and "in conjunction with the arrest of [Daughter] to bring before the Court" the Child. (Warrant (Ex. 1).) *See Maldonado*, 2006 WL 2588911, at *3 ("A 'mandate' includes a written direction of a court commanding that an act be done." (citing N.Y. Gen. Constr. L. § 28-a)). Since it is "well-settled that one duty of the Sheriff as an official of the court is to carry out the 'mandates' of the court," *id.* (citing C.P.L.R. § 2223; further citations omitted), "when a sheriff executes a facially valid court order, he is "afforded complete protection from liability . . . for any proper act done in its execution." *Id.* (quoting *Tornheim*, 363 F. Supp.2d at 676-77; further citations omitted). Of significance, the instant "Family Court-issued [W]arrant did not impose any express restrictions on the [Investigators'] execution thereof nor did it provide instructions as to the manner in which the [W]arrant was to be executed." *Mandola*, 222 F. Supp.3d at 216. Thus, for the reasons articulated, *infra*, the Investigators' actions did not violate the Plaintiffs' constitutional rights. Rather, by attempting to execute the facially valid Warrant, the Investigators were acting in accordance with their duty to carry out the mandate of the Family Court, thereby affording them the protection of absolute quasi-judicial immunity.

### 2. Qualified Immunity

Plaintiffs make short shrift the Defendants' invocation of qualified immunity arguing "it was objectively unreasonable for the Warrant Squad to believe that the [Daughter] and subject [Child] would be present at [the Fillmore House] on May 18 and June [4], 2013." (Opp'n at 10.)

In support of their argument that the Investigators knew their conduct was a violation of the Plaintiffs' clearly established Fourth Amendment rights, Plaintiffs quote Della Rocca's deposition testimony regarding his understanding that if he had a warrant and "reason to believe the person is in [the house]" he was "allowed to enter the warrant house or the house where the warrant address is." (*Id.* at 11 (quoting Della Rocca's Depo. Tr., 101-02).)

An officer is entitled to qualified immunity under § 1983, even in the absence of probable cause, where it is objectively reasonable that his actions are lawful at the time of the challenged act. *See, e.g., Betts v. Shearman*, 751 F.3d 78, 82-83 (2d Cir. 2014). In this instance, since the Investigators were acting pursuant to a valid Warrant of the Family Court, coupled with their reasonable belief that Daughter and Child were present in the Fillmore House when they made their May and June Attempts, as more fully discussed below (*see* Part III(B)(3)), they acted with objective reasonableness in believing their actions were lawful at the time of those attempts. *See id.* (quoting *Jenkins v. City of N.Y.*, 478 F.3d 76, 87 (2d Cir. 2007); *see also Mandola*, 222 F. Supp.3d at 218 ("Given that 'the touchstone of the Fourth Amendment is reasonableness[,]' the [deputy sheriffs'] entry of Plaintiffs' home pursuant to an arrest warrant [issued by the Family Court] is deemed constitutionally permissible conduct." (quoting *Florida v. Jimeno*, 500 U.S. 248, 250 (1991)); *cf., Jenkins*, 478 F.3d at 87 (stating an officer's determination is objectively reasonable if "officers of reasonable competence could disagree on whether the probable cause test was met"). Based upon the record, and because the reasonable belief standard is less stringent than the probable cause one, the Court finds that officers of reasonable competence, faced with the same facts and circumstances as known to the Investigators on May 18, 2013 and June 4, 2013, respectively, could have disagreed whether, on each occasion, there was a sufficient basis to reasonably believe that the Daughter and Child were present at the Warrant

Address.  That is sufficient to entitle the Investigators to qualified immunity from the Plaintiffs'

claims of constitutional violations arising out of the May and June Attempts.  *See Walczyk v. Rio*,

496 F.3d 139, 154 (2d Cir. 2006) ("Even if the right at issue was clearly established in certain

respects, . . . an officer is still entitled to qualified immunity if 'officers of reasonable

competence could disagree' on the legality of the action at issue in its particular factual context."

(quoting *Malley v. Briggs*, 475 U.S. at 341; further citations omitted)).  Thus, even if not entitled

to quasi-judicial immunity, the Investigators are entitled to qualified immunity from Plaintiffs' §

1983 claims.

       3.  <u>The May and June Attempts Did Not Give Rise to
Constitutional Violations</u>

Plaintiffs' claims of constitutional violations also focus on the Investigators' attempt

execute the arrest Warrant.  As previously stated, there is no dispute that the Warrant was valid.

Moreover, "[a]s a general matter, the police do not need a search warrant to enter a suspect's

home when they have an arrest warrant for that suspect."  *Mandola*, 222 F. Supp.3d at 217

(citing *United States v. Lauter*, 57 F.3d 212, 214 (2d Cir. 1995); *Payton*, 445 U.S. at 603.)

Therefore, "[b]efore any due process liability can be imposed for property damage occurring in a

lawful search, it must be established that the police acted unreasonably or maliciously in

bringing about the damage."  *Cody v. Mello*, 59 F.3d 13, 16 (2d Cir. 1995)(further citations

omitted).  "Mere negligence is not enough."  *Id.* (citing *Daniels v. Williams*, 474 U.S. 327, 333-

34 (1986)).

The issue here is whether at the time of the May and June Attempts it was reasonable for

the Investigators to believe that Daughter resided and was present at the Warrant Address.  *See,

e.g., Barlett*, 2005 WL 887112, at *5 ("[O]fficers who enter a dwelling in order to execute a

valid arrest warrant need only a 'reasonable belief that the suspect resides at the place to be

entered to execute an arrest warrant,' and a reasonable belief that 'the suspect is present.'"

(quoting *Lauter*, 57 F.3d at 215; further citation omitted)); *see also Lauter*, 57 F.3d at 214

(stating the reasonable belief standard requires a lesser showing than probable cause); *United States v. Manley*, 632 F.2d 978, 983 (2d Cir. 1980)("[T]he 'reasonable belief' standard . . . may require less justification than the more familiar probable cause standard.").

(*a.*)  *Belief as to Daughter's Residence*

The evidence shows that the Warrant lists the Fillmore Address as Daughter's "Home."

(*See* Warrant (Ex. A).)  Since there is no dispute that the Warrant was valid and there is no

evidence presented that any information in the Warrant was incorrect, it was reasonable for the

Investigators to believe that the Fillmore Address, identified as Daughter's "Home" in the

Warrant, was her residence.  Plaintiffs' attempt to dispute that, by relying upon notations in the

Investigation File, *i.e.*, that Daughter left the House on May 2, 2013 (*see id.* at 4), that her

Parents had not seen her "for a couple of days," and that, when called on May 9, 2013, Father

reported the Daughter may possibly be with her birth mother in Staten Island (*see id.* at 5), are

not inconsistent with the belief that the Fillmore House was Daughter's domicile.  Moreover, the

record evidence shows that the Investigators were unaware the Parents and Daughter were

adverse parties in the Family Court Action.

Plaintiffs' argument that the Investigators knew of the adverse relationship between the

Parents and Daughter, making the Investigators' belief that Daughter resided at the Fillmore

House unreasonable, is unpersuasive.  Other than Plaintiffs' conjecture, there is no record

evidence establishing that the Investigators knew the Parents initiated the Family Court Action

against their Daughter.  *See Anderson*, 477 U.S.at 249 (holding that to survive a summary

judgment motion, the nonmovant must do more than present evidence that is merely colorable);

*Corbett v. Firstline Security, Inc.*, 687 F. Supp.2d 124, 128 (E.D.N.Y. 2009) ("the non-moving party cannot survive summary judgment by casting mere 'metaphysical doubt' upon the evidence produced by the moving party" (quoting *Matsushita*, 475 U.S. at 586)). Nor does John's Affidavit prove otherwise. (*See* Ex. 1, ¶8 (stating, *inter alia*, that, on May 9, 2013, John "spoke with several individuals employed by the County of Suffolk charged with locating [Daughter] and [Child]" and provided "possible addresses for [Daughter], and the identities of individuals who may have information as to [Daughter and Child's] whereabouts").) Rather, the competent evidence establishes that the Investigators were unaware that the Parents were adverse parties to the Daughter in the Family Court Action (*see* Rule 56.1 Statement, ¶45), and unaware that Father had informed the Family Court that Daughter was no longer in the Fillmore House (*see id.*, ¶ 46). The notations in the Investigation File do not contradict this. Further, the Investigation File does not contain a copy of the Parents' Family Court petition for custody.[7] (*See* Ex. D, *in toto*.) Without competent evidence disputing Della Rocca's and Rapp's deposition testimony that they were unaware of the adverse relationship between Parents and Daughter, on the record presented it was reasonable for the Investigators to believe that the Fillmore House remained the Daughter's residence. This reasonable belief was fortified by the Investigators first visiting other possible locations where Daughter might be found, but confirming she was not at those locations, before both their May and June Attempts.

---

[7] Even if the Investigators were aware of the adverse relationship between the Parents and Daughter, in the context of the Family Court Action, which could be an evolving situation, such information does not necessary establish that it would have been unreasonable for the Investigators to belief that the Fillmore Address remained Daughter's residence.

*(b.)*  *Belief as to Daughter's Presence at Residence*

(i.)  The May Attempt

Based upon information Rapp procured days before the May Attempt when he canvassed the area near the Fillmore Address, *i.e.*, that the Daughter had recently been seen at that location on the weekends, it was reasonable for the Investigators to believe she may have been there on May 18, 2013.  Rapp's failure to note the source of his information does not make the Investigators' reliance on that information unreasonable in light of Rapp's testimony: explaining that the woman wished to remain anonymous (*see* Rapp Depo. Tr., 48-50); describing the woman's approximate location to the Fillmore Address when Rapp spoke with her (*see id.* at 47, 53); and, providing a physical description of the woman (*see id.* at 54).  The Plaintiffs claim that Rapp fabricated this information.  (*See, e.g.*, Opp'n at 7; *see also id.* at 4 (characterizing testimony as "wholly unsupported").)  However, to avoid summary judgment, the Plaintiffs must do more than rely upon "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996); *see also Ying Jung Gan v. City of N.Y.*, 996 F.2d 522, 532 (2d Cir. 1993) (stating that nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible," but must produce evidence to dispute fact).  There is no reason why the same should not hold true for sworn deposition testimony.  (*See* Rapp. Depo. Tr., 5.)  In the absence of competent evidence challenging Rapp's testimony about the information provided to him by an anonymous woman regarding the Daughter, the Investigators' belief that Daughter may be present at the Fillmore Address on May 18, 2013, was reasonable.

(ii.) The June Attempt

While it is true, as the Plaintiffs contend, that, upon the June 4, 2013 return of the Investigators to the Fillmore Address, the Investigators had no leads and were unaware of the whereabouts of Daughter and Child, that changed after their encounter with Maurice. Once the Investigators "were confronted by the recalcitrance [of] Maurice[,] . . . their reasonable belief that [Daughter] could be present manifested itself." (Reply at 7; *see also* Rule 56.1 Statement, ¶56.) This, in conjunction with the following, provided the basis for the Investigators to reasonably believe that Daughter and Child may be present at the Fillmore House at that time: the Investigators' attested lack of awareness of the contentious relationship between Parents and Daughter (*see* Rule 56.1 Statement, ¶¶45-46); the Investigators' field experience in executing other warrants where families are cooperative with investigators in their efforts to locate a child (*see id.* at ¶55); and, in his June 4th phone conversation with Della Rocca, John's saying nothing to dissuade the Investigators from the belief that Daughter and Child may be present within the House (*see id.* at ¶59; *see also* John's Affidavit, ¶11 ("The sum and substance of our conversation on June 4, 2013 concerned my complaints to him about his May 18, 2013 break-in of my house and the money he stole.")).

To the extent the Plaintiffs try to debunk the Investigators' reasonable belief regarding the June Attempt by relying on John's Affidavit, it is futile. In particular, in his Affidavit, John attests that in a May 20, 2013 telephone call with Della Rocca, he advised Della Rocca that Daughter and Child were not at the Fillmore Address since May 2, 2013, when they left. (*See* John's Affidavit, ¶13.) However, that statement is inconsistent with John's earlier testimony regarding the content of this conversation (*See* John §50-h Hr'g Tr. 72-74), and the Plaintiffs have failed to make any effort to reconcile or otherwise explain the inconsistency. Therefore, it

will not be considered by the Court. *See, e.g., Buttry*, 68 F.3d at 1493 ("[I]t is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment."). However, even if it were to credit John's Affidavit statement regarding the context of his May 20th conversation with Della Rocca, the Court agrees with the Defendants that it would "have [had] little impact on the actions of the [Investigators] on June 4, 2013" (Reply at 7) as more than two weeks had passed since that conversation, rendering it stale, and the June 4th interation with Maurice provided the Investigators with a basis to form a new reasonable belief as to the Daughter's presence.

### (*c.*) *Property Damage Incurred During May Attempt*

As discussed, *supra*, because the Investigators had a valid Warrant and a reasonable belief that Daughter and Child may have been present in the Fillmore House when they attempted to execute the Warrant, their search of the House was lawful. No evidence has been presented that the Investigators acted unreasonably or maliciously in bringing about the damage to the locked interior doors, which they pried open with a credit card or pocket knife. Ironically, the Plaintiffs would fault the Investigators for using less intrusive means of opening the locked doors than more aggressive means approved by the Sheriff's Department. (*See, e.g.*, Opp'n at 13 (complaining that the Investigators "circumvent locked door [*sic*] with credit cards, pocket knives, etc., while eschewing the use of door rams and pry bars that the Warrant Squad are actually instructed to use").) Hence, there is no basis to impose due process liability upon the Defendants for bringing about property damage.

### 4. McGarty's Shove Was Not Use of Excessive Force

"[T]here may be certain circumstances where the alleged unconstitutional act and injury are so *de minimis* that it cannot rise to a constitutional violation as a matter of law." *Hodge*, 838

F. Supp.2d at 75-76 (collecting cases); *see also Ferebee v. City of N.Y.*, No. 15-cv-1868, 2017 WL 2930587, at *8 (S.D.N.Y. July 6, 2017)(explaining that a "*de minimis* injury can serve as conclusive evidence that *de minimis* force was used" (omitting further citations)). "Pushes or shoves that cause no injury cannot support an excessive force claim." *Ferebee*, 2017 WL 2930587, at *8 (citing *Walzer v. Town of Orangetown*, No. 13-cv-7971, 2015 WL 1539956, *10 (S.D.N.Y. Apr. 7, 2015)(dismissing excessive force claim where plaintiff did not allege that he suffered any injuries as a result of officer's push)). *See also Rodriguez v. Vill. of Ossining*, 918 F. Supp.2d 230, 238 (S.D.N.Y. 2013) (granting summary judgment on excessive force claim because the undisputed facts indicated that the defendant's use of force was *de minimis* where plaintiff alleged only that the defendant "grabbed [her] arm" and "scratch[ed] her," without alleging that the scratch was "even remotely painful or serious"); *Jenneiahn v. Vill. of Avon*, 575 F. Supp. 2d 473, 480 (W.D.N.Y. 2008) (granting summary judgment on excessive force claim because the undisputed facts indicated that the defendant's use of force was *de minimis* where, although plaintiff alleged that the defendant's conduct included "forceful grabbing, pulling, spinning, pushing, slapping down, clamping and twisting," plaintiff alleged "no demonstrable physical injury as a result" (emphasis in original)); *Lemmo*, 2011 WL 843974, at *5 ("Injuries held to be *de minimis* for purposes of defeating excessive force claims include short-term pain, swelling, and bruising, brief numbness from tight handcuffing, claims of minor discomfort from tight handcuffing, and two superficial scratches with a cut inside the mouth." (internal citations omitted) (collecting cases)).

Considering the facts and circumstance of the instant case, Maurice cannot make out a claim of excessive force. By his own admission, McGarty's shove did not cause Maurice any injury. (*See* Rule 56.1 Counter, ¶63.) Moreover, the Investigators, as officers of the Family

Court, had a substantial state interest in executing the valid Warrant to promote the best interests of the Child. It was not objectively unreasonable for McGarty to shove Maurice to the side when Maurice verbalized resistance to the Investigators entering the Fillmore House to search for Daughter and Child in light of the purpose of the Warrant. Thus, no reasonable trier of fact could determine that McGarty used excessive force when pushing Maurice aside from the front door of the Fillmore House on June 4, 2013. Accordingly, because the evidence shows no injury related to the shove, Maurice's excessive force claim fails as a matter of law. *See Sethi*, 2014 WL 2526620, at *5 (concluding, where plaintiff admitted to sustaining no injuries as a result of encounter with police officer that 'as a matter of law, such amount of force cannot be considered excessive" (internal quotation marks committed; collecting cases).

    5. *Monell* Claim

   In opposition to the Defendants' contention that Plaintiffs' *Monell* claims should be dismissed, Plaintiffs claim that the evidence does support claims of constitutional violations and federal causes of action. (*See* Opp'n at 12.) Contrary to Plaintiffs' assertions, however, the record presented shows that Plaintiffs are unable to establish a violation of their constitutional rights, let alone, pursuant to a custom or policy; therefore, as a matter of law, their *Monell* claims fails. *See, e.g., Askins v. Doe 1*, 727 F.3d 248, 253 (2d Cir. 2013)("Establishing the liability of the municipality requires a showing that the plaintiff suffered a tort in violation of federal law committed by the municipal actors and, in addition, that their commission of the tort resulted from a custom or policy of the municipality." (citations omitted)). To the extent the Plaintiffs imply that the County has inadequately trained or supervised its Investigators, they are "required to 'identify a specific deficiency in the [County's] training program and establish that [that] deficiency is 'closely related to the ultimate injury,' such that it 'actually caused' the

constitutional deprivation." *White*, 2019 WL 1428438, at *4 (quoting *Amnesty Am.*, 361 F.3d at 129; further citation omitted)). In support of their position but without citation to the record, Plaintiffs contend that when "breaking into houses," the "Warrant Squad [Investigators] have been instructed by more senior Warrant Squad officers to circumvent locked door [*sic*] with credit cards, pocket knives, etc., while eschewing the use of door rams and pry bars that the Warrant Squad are actually instructed to use." (Opp'n at 13.) This is not "evidence of a deficiency in the [County's] training program"; nor does it "advance[] any theory as to how a faulty training program caused the [Investigators] to commit the alleged constitutional violations in this case." *White*, 2019 WL 1428438, at *4. Rather, the record evidence shows that Della Rocca, who has not been shown to be a policy maker for the Sheriff's Department, testified that he, not the other Investigators, was trained by more senior investigators regarding the use of credit cards and pocket knives to circumvent locked doors. (*See* Della Rocca Depo. Tr., 99:22-101:4.) Moreover, Della Rocca further testified that while he instructed that the interior doors be opened during the May Attempt (*see id.* at 92), he was not sure what device was used to unlock those doors (*see id.* at 90-91) as he was not the person to unlock them (*see id.* at 91). At best, then, the record evidence shows no more than a single incident of purported improper procedure, which "is insufficient to raise the inference that the [Investigators were] improperly trained." *White*, 2019 WL 1428438, at *4 (citing *Dwares v. City of N.Y.*, 985 F.2d 94, 100-01 (2d Cir. 1993); *see also City of Oklahoma v. Tutle*, 471 U.S. 808, 823-24 (1985)(holding a single incident involving employee below the policymaking level generally will not suffice to support inference of a municipal custom or policy).

6. <u>§ 1986 Cause of Action</u>

Plaintiffs' § 1986 claim appears to be based upon the Officers' alleged failure to investigate John's Burglary Complaint. (*See* Opp'n at 11-12 ("Plaintiffs' claims against the [Officers] include, without limitation, allegations that the [Officers] failed to investigate; respond to the plaintiffs [*sic*] inquiries; shielded the [Investigators] from criminal prosecution; and, violated the plaintiffs' civil rights under 42 U.S.C. § 1983 and 42 U.S.C. § 1986.").)  However, "a 'failure to investigate' [claim] is not independently cognizable as a stand-alone claim . . . ." *McCaffrey v. City of N.Y.*, No. 11-cv-1636, 2013 WL 494025, *5 (S.D.N.Y. Feb. 7, 2013) (citations omitted).  Rather, "in the context of § 1983, allegations of officers' failure to investigate are considered under the rubric of false imprisonment, false arrest, or malicious prosecution." *Campbell v. Giuiliani*, No. 99-cv-2603, 2000 WL 194815, at *3 n.6 (E.D.N.Y. Feb. 16, 2000).  No such claims have been brought by Plaintiffs.  Moreover, nowhere in their Complaint do Plaintiffs allege a § 1985 conspiracy cause of action, the necessary predicate to a § 1986 claim.  *See Thomas*, 165 F.3d at 147 ("[A] § 1986 claim must be predicated upon a valid § 1985 claim." (quoting *Mian v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 7 F.3d 1085, 1088 (2d Cir. 1993); further citations omitted)); *White*, 2019 WL 1428438, at *5 (where § 1985 claim found not viable, granting summary dismissal of plaintiff's § 1986 claim); *cf., e.g., Mass v. McClenahan*, 893 F. Supp. 225, 231 (S.D.N.Y. 1995)("Absent specific factual allegations as to the participation of a particular defendant in the conspiracy, plaintiff's § 1985(3) claim cannot survive a motion for summary judgment by the defendant.").  Accordingly, as a matter of law, the Defendants are entitled to the dismissal of Plaintiffs' § 1986 cause of action.

7. <u>Plaintiffs' Claim re: Failure to Supervise (Third Cause of Action)</u>

To the extent the Plaintiffs brought a separate cause of action based upon Della Rocca's alleged failure to train and supervise other Investigators (*see* Complaint, Third Cause of Action, ¶¶72-77), that cause of action is subsumed within Plaintiffs' *Monell* claim.  (*See supra* at Part III(B)(5)(finding Plaintiffs have failed to sustain a *Monell* cause of action).  To the extent Plaintiffs sought to maintain a separate failure-to-supervise cause of action, neither the Defendants nor the Plaintiffs have specifically or meaningfully addressed that cause of action. Accordingly, that purported separate claim is deemed waived.  *See, e.g.*, *See, e.g., Jackson v. Fed. Express*, 766 F.3d 189, 198 (2d Cir. 2014)("[I]n the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned."); *Camarda v. Selover*, 673 F. App'x 26, 30 (2d Cir. 2016)("Even where abandonment by a counseled party is not explicit, a court may infer abandonment from the papers and circumstances viewed as a whole." (internal quotation marks and citation omitted)); *Neurological Surgery, P.C. v. Travelers Co.*, 243 F. Supp.3d 318, 329 (E.D.N.Y. 2017)(deeming an argument waived because it was not addressed in a party's opposition brief); *see also Patacca v. CSC Hldgs, LLC*, No. 16-cv-679, 2019 WL 1676001, at *13 (E.D.N.Y. Apr. 17, 2019)(deeming waived claims which are not fully addressed in opposition papers)(collecting cases); *Petrisch v. HSBC Bank USA, Inc.,* No. 07-cv-3303, 2013 WL 1316712, at *17 (E.D.N.Y. Mar. 28, 2013)(collecting cases holding that where party fails to address arguments in opposition papers on summary judgment motion, the claim is deemed abandoned); *Bryant v. S. Country Cent. Sch. Dist.*, No. 14-cv-5621, 2017 WL 1216553, at *19 (E.D.N.Y. Mar. 31, 2017)(in failing to pursue theory in support of claim, claim is deemed waived); *Robinson v. Am. Int'l Grp., Inc.*, No. 08-cv-1724, 2009 WL 3154312, at *4 & n.65

(S.D.N.Y. Sept. 30, 2009) (collecting cases where claims deemed abandoned for failing to oppose arguments raised in summary judgment motions), *aff'd,* 396 F. App'x 781 (2d Cir. 2010).

### 8. Court Declines to Exercise Supplemental Jurisdiction

Regarding their pendent state law causes of action against the Defendants, having determined that the Defendants are entitled to summary judgment on all of Plaintiffs' § 1983 claims and their § 1986 claim, the Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims. *See* 28 U.S.C. § 1367(c)(3); *see also Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 727 (2d Cir. 2013) ("It is well to recall that 'in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims.'" *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 306, (2d Cir. 2003)(quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1998)); *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006)(same); *Mandola*, 222 F. Supp.3d at 222.

\* \* \*

The Court has considered the Plaintiffs' remaining arguments. While the Court agrees with the Plaintiffs that the Defendants' reliance upon the Emergency Aid Doctrine is unpersuasive, that doctrine has no applicability in this instance because the Investigators' actions were pursuant to the valid Warrant; thus, there was no need to invoke the Emergency Aid Doctrine, which is an exception to proceeding without a warrant. *See, e.g., Kentucky v. King*, 563 U.S. 452, 459-60 (2011) ("Under the 'emergency aid' exception, . . . officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an

occupant from imminent injury" (internal quotations omitted; citation omitted)). However, because the Court has found no constitutional violations and, in any event, that the Defendants are entitled to immunities, the Plaintiffs' opposition to the Defendants' reliance on the Emergency Aid Doctrine is insufficient to defeat the Summary Judgment Motion. All Plaintiffs' other arguments are found to be without merit.

IV.    Conclusion

Accordingly, after drawing all inferences and resolving all ambiguities in favor of the Plaintiffs, but finding that no rational jury could find in their favor, IT IS HEREBY ORDERED that the Defendants' Summary Judgment Motion is GRANTED to the extent:

*A.* Plaintiffs' Counts I, II, III, and IV are dismissed with prejudice;

*B.* Plaintiffs' pendent state-law claims (*i.e.*, Counts V-XIV) are dismissed without prejudice; and

*C.* the Clerk of Court is directed to enter judgment in favor of the Defendants and, thereafter, close this case.

* * *

The September 26, 2019 Status Conference is marked off the Court's calendar.

SO ORDERED this 27th day of August 2019 at Central Islip, New York.

/s/ *Sandra J. Feuerstein*

Sandra J. Feuerstein
United States District Judge